J-S52037-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ROBERT LEWIS BAILEY, SR. :
:
Appellant : No. 1220 EDA 2020

Appeal from the Judgment of Sentence Entered November 18, 2019
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001050-2016

BEFORE:  PANELLA, P.J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: FEBRUARY 19, 2021**

Appellant, Robert Lewis Bailey, Sr., appeals from the judgment of sentence entered by the Court of Common Pleas of Chester County after a jury convicted him of multiple sex offenses for his 26-month course of conduct with a young girl who was from 7 to 9 years of age at the relevant times. Sentenced to an aggregate term of incarceration of 23 to 46 years, Appellant raises numerous challenges in which he assails the court's order denying his pretrial Motion for Particularity of Anticipated Proof, the sufficiency of evidence offered on the charge of Aggravated Indecent Assault, his sentencing scheme based on the Aggravated Indecent Assault conviction, his conviction on the charge of Corruption of Minors, and the creation of a fictitious second count of Aggravated Indecent Assault for purposes of cataloguing the conviction in the

_____

[*] Former Justice specially assigned to the Superior Court.

county's electronic case management system. We affirm, but remand with instructions pertaining to proper recordation of convictions listed on Appellant's sentencing sheet.

The trial court provides a comprehensive and salient statement of facts and procedural history of the present matter, as follows:

On April 6, 2016, the Commonwealth filed an Information against Appellant charging him with one count (Count I) of Criminal Solicitation to Commit Rape of a Child, 18 Pa.C.S.A. §§ 902, 3121(c)[,] six counts (Counts II-VII) of Indecent Assault, 18 Pa.C.S.A. § 3127(a)(7)[,] and one count (Count VIII) of Corruption of Minors, 18 Pa.C.S.A. § 6301(a)(1)(ii).

The Commonwealth amended the information on January 16, 2019 to add two counts (Counts IX and X) of Aggravated Indecent Assault, 18 Pa.C.S.A. § 3125(a)(1),(b) (Count IX), and 18 Pa.C.S.A. § 3125(a)(7) (Count X). The charges stemmed from the repeated sexual abuse of a minor child by Appellant, . . . over the course of two years, from January 8, 2014 through March 3, 2016.

After several pre-trial motions by both parties, trial began in this matter with jury selection on March 4, 2019. On March 7, 2019, on the record in open court on the third and last day of trial outside of the presence of the jury, the Commonwealth withdrew [numerous counts, leaving four counts—Counts I, II, VIII, and IX for the jury]. On March 7, 2019, the jury returned a verdict of guilty as to all four remaining charges[.] A Pre-Sentence Investigative Report was ordered on March 8, 2019. Also on March 8, 2019, [the trial court] issued an order directing the Sexual Offenders Assessment Board to evaluate Appellant and make a recommendation as to whether he qualified as a Sexually Violent Predator.

[On November 18, 2019, the court imposed the following sentence: on Count I, Solicitation to Commit Rape of a Child, 17 to 34 years' incarceration; on Count II, Indecent Assault, 3 to 6 years' incarceration, to run consecutively to the sentence at Count I; on Count VIII, Corruption of Minors, 3 to 6 years' incarceration,

to run consecutively to Count II; and on Count IX, Aggravated Indecent Assault, 10 to 20 years' incarceration, to run concurrently to the sentence at Count I. Appellant's aggregate sentence is 23 to 46 years' incarceration.]

Also on November 18, 2019, [it was] determined Appellant was a Sexually Violent Predator[, and the court] directed him to comply with the requirements of SORNA. However, [the trial court] granted Appellant's motion for a stay of the application of SORNA until the **Commonwealth v. Torsilieri** and **Commonwealth v. Lacombe** cases were resolved by the Pennsylvania Supreme Court.

On December 2, 2019, Appellant filed a counseled Post Sentence Motion[, which the court denied on March 18, 2020.] On April 17, 2020, Appellant filed his Notice of Appeal. On April 22, 2020, [the court] issued an Order directing Appellant to file within twenty-one days a Concise Statement of Errors Complained of on Appeal . . . pursuant to Pa.R.A.P. 1925(b). Defendant timely complied on May 13, 2020.

. . .

[The facts relevant to present appeal are as follows:] Defendant Robert Bailey [hereinafter "Appellant"], was a neighbor at the apartment complex where the victim, S.S., born [in 2006], lived from 2010 to November 2016 with her siblings and her mother, [Mother]. Appellant was a handyman of sorts at the apartment complex. Mother's children played with [Appellant's] grandchildren and Mother testified that her children were allowed to go inside Appellant's home.

Mother, who had two other minor children at the time of these events, allowed Appellant to take her children to local parks three to four times per week in the evenings from 4:00 p.m. to 6:00 p.m. According to Mother, other neighborhood children always went with Appellant and her children to the parks. Neither Mother nor any other adult would ever accompany Appellant and the children on their excursions. Mother also testified that her children would also spend time with Appellant on the weekends while she had to work.

On March 3, 2016, while Mother was at a friend's house with S.S., the friend's son, J.T., who was nine or ten at the time, told Mother

- 3 -

that "Bob [Appellant] likes [S.S.] more than the other kids." Mother's friend asked her son what he meant. At this moment, S.S. put her head down. J.T. replied to his mother, "he likes her better."

At the urging of her friend, Mother called the police. Mother and S.S. stayed at her friend's house and the police arrived there that evening to speak with her and her daughter, S.S. Mother left the questioning of her daughter to the police because she did not want S.S. to think that her mother was "making her say something."

The law enforcement officer who initially responded to Mother's call was Trooper Nicholas Baton, at that time a Pennsylvania State Trooper employed with Troop J in the Embreeville Barracks. Trooper Baton's interview with S.S. was audio recorded. Trooper Baton told S.S. that he had "heard there was a problem between her and her neighbor" and asked if she could tell him what was going on. S.S. responded, "S-E-X."

According to Trooper Batons testimony, S.S. told him that

> her neighbor, [Appellant], . . . has been grabbing her buttocks, has been kissing her, has been taking her to the park. If she would go outside, if there was [sic] no other adults around or any other children around, [Appellant] would come out of his house, talk to her, try to flirt with her, and he would grab her by the hand.

N.T. (Trial), 3/5/19, 77. Trooper Baton further stated,

> She also told me about when she would hang out at the park on Supplee Road with her friends, if [Appellant] was there, he would watch her, wait til [sic] she was alone, take her some place, talk to her and touch her, kiss her.

N.T. at 78. Trooper Baton added that S.S. also told him that one time [Appellant] had given her a necklace as a gift. She told Trooper Baton that she did not want the necklace and threw it away.

Trooper Baton testified that in his police report which he prepared as soon as he returned to the barracks following his interview with

- 4 -

S.S., he recorded that S.S. had told him that [Appellant] would force her to go to the park with him. He recorded that she told him that Appellant would grab her by the hand or put his arm around her and carry her to the park. Trooper Baton also recorded that S.S. told him that Appellant would additionally grab her around the stomach and take her to the park.

Trooper Baton recorded in his report that S.S. told him that if there were ever other children around, Appellant would always wait until they were gone before he would approach her. Trooper Baton recorded in his report that S.S. told him that if there were other children in the park who were friends that she knew, Appellant would whisper in her ear and would talk to her when the other children weren't looking. He recorded that if there were children there whom he did not know or with whom he was not familiar, he would wait to talk to her until they were gone.

According to Trooper Baton's testimony, S.S. told him that Appellant would ask her to marry him, ask her for sex, tell her he wanted it from her, and told her that he was having dreams about it with her. S.S. told Trooper Baton that Appellant grabbed her "many times." Trooper Baton related that "[s]he said it could have been over 100" times that this happened. Trooper Baton testified that S.S. remembered Appellant "kissing her and putting his tongue, like, in her mouth about twenty times." S.S. told him that if other children were around, Appellant would wait until it would be just him and her and that nothing happened when the other children were around. S.S. was nine years old at the time of her interview with Trooper Baton. She was twelve at the time of trial. After speaking with S.S. on March 3, 2016, Trooper Baton referred the case to the crime investigators in the Pennsylvania State Police.

In March of 2016, Corporal Lori Kistle, formerly Trooper Lori Edgar, a three-year veteran of the Pennsylvania State Police with specific training in forensic interviewing of child sex crimes victims who is now assigned to the child crimes/sexual abuse crimes in a supervisory capacity, conducted recorded interviews of S.S., her sister Sk.S., and the boy who initially brought these allegations to light on March 3, 2016, J.T.

At trial Corporal Kistle read to the jury a portion of the transcript of her recorded interview with S.S. where S.S. told Corporal Kistle that Appellant's abuse had been going on for five years and that

as recently as one week prior to the interview, Appellant had even made inappropriate comments to her sister.

Corporal Kistle then read from a transcript of her interview with S.S.'s sister, Sk.S. Sk.S. also told Corporal Kistle that Appellant had been abusing S.S. for five years. Sk.S. told Corporal Kistle that she observed Appellant touch S.S.'s vagina. Further in the transcript of Corporal Kistle's interview with Sk.S., Sk.S. said that Appellant "would, like, grab her [S.S.] and then just like, puts his other hand like this, and then did that, do that little tongue thing . . . Like how you like, wiggle your tongue and your fingers like this."

Sk.S. told Corporal Kistle during this interview that she never saw Appellant touch anyone else. Sk.S. also told Corporal Kistle that S.S. would scream when Appellant tried touching her and that Sk.S. would then yell at Appellant to stop touching and grabbing her sister "cause it's kinda child abuse when you're doing that." She said that Appellant would respond "why do I have to do that?" and Sk.S. would tell him to go. Sk.S. told Corporal Kistle that Appellant would then just walk away without saying anything. She told Corporal Kistle that she believed Appellant was afraid of her.

In Corporal Kistle's recorded interview with J.T., J.T. told Corporal Kistle that he has witnessed Appellant grab S.S.'s breast and try to kiss her on the lips. J.T. told Corporal Kistle that S.S. told him that Appellant has asked her for sex.

In March of 2016, Corporal Kistle spoke with Appellant outside of the apartment complex where he and the victim lived. Corporal Kistle is the one who filed the charges in this matter. Corporal Kistle initially advised Appellant that she was placing him under arrest and gave him *Miranda* [warnings]. She then transported him to the Embreeville Barracks where she spoke with him at length.

Appellant told Corporal Kistle that he had been living at the apartment complex in Honey Brook for five years. Appellant confirmed to Corporal Kistle that he would take the neighborhood children, including S.S. and her sister Sk.S. to the park. He agreed that no other adults accompanied him and the children to the park. He told Corporal Kistle that he and the children had a good relationship, that he was, as he said, "attracted" to all of their personalities, and that he took care of them. He denied any

sexual attraction to the children. Defendant denied ever touching or kissing S.S., but stated he hugged her once to comfort her when she was crying.

Later in the interview, Corporal Kistle again asked Appellant if he ever kissed S.S. This time, Appellant admitted that he had. Corporal Kistle asked if he kissed S.S. on the lips. Appellant said that he did one time because she was crying. Corporal Kistle asked Appellant if he ever touched S.S.'s vagina. Appellant said, "no." Corporal Kistle asked Appellant if there would ever have been a reason why his hand might have been near S.S.'s vagina. Appellant stated that "maybe his hand would be down there if he needed to remove a leaf or something from her leg or something of that nature."

Corporal Kistle asked Appellant if he ever asked S.S. or said to her, "will you marry me?" Appellant told Corporal Kistle that he did it "a few times" because he wanted to see her turn red and that it was just a joke. He denied ever touching S.S.'s buttocks. He told Corporal Kistle that if he and S.S. passed in the doorway it was possible that his hand may have touched her chest. Appellant admitted to Corporal Kistle that he would sometimes drink "lightly" in the children's presence, but would leave drinking more heavily until he was inside his house. Corporal Kistle identified Appellant at trial and testified that he was over the age of eighteen. The defense stipulated as to Appellant's age.

Over the ensuing months, this case was prepared for trial. At the end of September 2018, while Mother was having a conversation with S.S. about the upcoming trial scheduled for October of 2018, S.S. began crying and told her mother that she had "lied." Mother testified that she thought perhaps her daughter was lying about everything. S.S. said, "[N]o, mom. I lied. He actually went inside of me, but I didn't want to get him in trouble." Mother called the prosecutor and informed her of S.S.'s new disclosure. The Commonwealth had S.S. forensically interviewed regarding the new allegation.

Detective Christine Bleiler is employed by the Chester County Detectives in their Child Abuse Unit. She is a trained forensic interviewer. Part of her duties involve aiding the Pennsylvania State Police by doing forensic interviews of children in child abuse cases.

Detective Bleiler interviewed S.S. regarding the new allegations on October 2, 2018. S.S. was eleven years old at the time of their interview. Detective Bleiler's October 2, 2018 interview with S.S. was audio-visually recorded. During this interview. S.S. told Detective Bleiler that on one occasion in Appellant's apartment, S.S. entered the bedroom of her friend, B.B., Appellant's grandson, where she encountered a naked Appellant, who then removed her clothes, threw her on the bed, covered her mouth, and inserted something into her vagina that caused her pain.

Detective Bleiler confirmed that in the course of her interview with S.S., the child had told her that during this incident, she could smell alcohol on Appellant's breath. Detective Bleiler also testified that S.S. told her during this interview that she had told her mother that Appellant would "always put his tongue down my throat like a regular man would always do." S.S.'s new allegations against Appellant gave rise to the addition of two new charges of Aggravated Indecent Assault by way of the Amended Information.

This case was ultimately brought to trial in early March of 2019. S.S. testified at trial. She corroborated her mother's account of how all of these revelations first came about. She remembered speaking with Trooper Baton in March 2016. She testified that she spoke with Trooper Baton about Appellant, whom she identified in court. S.S. testified that although she remembered talking to the police, by the time of trial she did not remember everything she had told them.

S.S. testified that she knew Appellant through playing with his grandchildren, in particular, his grandson B.B., also minors. S.S. testified that Appellant would take her and all of her friends to the park after she did her homework. She said that he did this "every other day or so." She testified that her mother was not home during these times. S.S. confirmed that no other adults went to the park with Appellant and the children. She testified that Appellant would tell her she was pretty.

S.S. explained some of the incidents that had occurred between herself and Appellant. She stated,

> Whenever I was like a little bit behind the kids because
> I used to not like to run around, I still don't, [s]ince I
> was behind them a little bit, he would try kissing me
> and I did not know what to do because I was younger

- 8 -

and I was confused. And at the time, he was always drinking at the time. And then, like, that happened at the park and then he, like, kept doing that every time we went to the park. Sometimes he would do that when I was inside their house too.

N.T. at 109-110. S.S. testified that she was approximately eight years old when these incidents happened.

S.S. testified that when Appellant tried to kiss her, it would always occur near the park's swings because she would be lagging behind as the other children ran off. She testified that Appellant used his tongue and held her head when he kissed her. She said that during these incidents, Appellant would only kiss her on the mouth. She said this happened "almost every time we went to the park."

S.S. testified that Appellant also touched her vagina and other body parts over her clothes when the two were alone together in the kitchen of his house. S.S. testified that she always told J.T. about these incidents but they were afraid to tell anyone because they were worried that they might ruin their friendship with B.B., Appellant's grandson. After she made her first disclosures to the police, she in fact was no longer permitted to socialize with him and they are not friends anymore. J.T. remains friends with Appellant's grandson. S.S. testified that she remembered Appellant telling her that the two of them should get married and that he would love to marry her.

With regard to the incident forming the basis of the two new charges of Aggravated Indecent Assault, S.S. testified that she did not tell anyone about this event until she confided in her mother in March 2016. She explained at trial that the incident giving rise to these charges occurred at Appellant's apartment in Honey Brook, where her friend B.B. lived. As she related:

I was, like, in the kitchen getting a drink and I did not know where [Appellant] was or [B.B.] because they went outside after I, like, walked in the living room, I think. So, I went back near his rooms to, like, find him. And when I went in the one room he— [Appellant] was in there and then all I remember is him taking off my clothes. And then all I know is that

> he was on top of me, but I don't know, but something
> did go inside of me and I don't know what it was.

N.T., 3/5/19, 116-17, 118.

S.S. said that she had not seen Appellant holding any item in his hand when he climbed on top of her. N.T. at 120. S.S. said the room that she had gone into was B.B.'s room. N.T. at 117. She said Appellant had been naked. N.T. at 118. As she further described, "[A]ll I remember is, like, I ended up on the bed, and then, like, all I saw was him moving and I felt something and it was, like, painful and—but I don't know what it was." N.T. at 118. She said she was lying on her back on the bed. N.T. at 118-19. She testified the pain she felt was in her vagina. N.T. at 119. She testified that whatever was causing her pain was moving. N.T. at 120. S.S. said this incident occurred "a couple of years before I told the cops," but that she couldn't recall exactly how old she was. N.T. at 120-21. She testified that during this incident she could smell the odor of beer. N.T. at 122. S.S. testified that she has had to change schools since these allegations arose because her peers were writing on the bathroom walls that she was raped and that they hoped she would lose in court. N.T. at 142-43.

. . .

The Commonwealth next introduced the testimony of the victim's older sister, Sk.S., who was fourteen years old at the time. Sk.S. corroborated S.S.'s testimony that Appellant would take her and the other neighborhood children to the park every other day. She also said sometimes Appellant would come to her cousin's house just to "hang out" with the children.

Sk.S. corroborated that no other adults accompanied Appellant and the children to the park. She testified that when they were at the park she observed several times Appellant would grab her sister's buttocks with his hands, pull her to the side of the group and whisper in her ear. She said he would pull S.S. "pretty distant from everybody else." Sk.S. stated that she heard Appellant keep asking her sister to marry him and that he tried getting S.S. to "go in the bed with him." N.T. at 159.

She testified that she saw Appellant grab S.S.'s head, pull her towards him, and try kissing S.S. on the lips multiple times. Sk.S.

said that Appellant would pull S.S. away from the other children most of the times they went to the park.

. . .

Sk.S., on cross-examination, agreed that Appellant had never forced S.S. to go to the park. Sk.S. testified that she too has had to switch schools because of these incidents because her peers were telling her to kill herself.

The Commonwealth next presented the testimony of thirteen year-old K.M., S.S.'s and Sk.S.'s friend and schoolmate. K.M. testified that Appellant hugged her once or twice and would tell her that she was "looking good today." She also said that Appellant would sometimes try to kiss her on her head.

. . .

The defense presented the testimony of two witnesses on Appellant's behalf, one of whom was Appellant himself. The first witness was Elizabeth Hillenbrand, who lived in the same apartment complex as Appellant, the victim, and the victim's family lived at the time of these events. Ms. Hillenbrand testified the victim and her sister were always left alone. Their father was incarcerated and their mother was never home.

. . .

Appellant, who was 58 years old at the time of trial, testified on his own behalf at trial. Appellant denied having any sexual contact with S.S. and Sk.S. He admitted to taking the neighborhood children to the park and other places in Honey Brook. He testified that he had a triple bypass in 2014 and that later, in 2015, he went back to the hospital for surgery to have talon clamps installed in his chest to hold his breast plate together. He explained that as a result of these events, he would not have had the strength to pick someone up and carry them, or to squeeze someone in a hug or otherwise. He testified that he never took walks without several children in attendance; that is, he was never alone with one child when he took these excursions with the neighborhood children.

. . .

- 11 -

Appellant asserted that his common law wife forbade the children from coming into their apartment. He said that the only child who was allowed in Appellant's apartment was J.T., whom he described as his grandson B.B.'s best friend.

Appellant testified that he is never alone with any one child in the park. He admitted that he kissed S.S. on the lips one time briefly, before she was school-aged, when she fell or got hurt in the yard. He claimed it was an accident that occurred because S.S. moved her head while he was trying to kiss her cheek. He denied that the incident S.S. described of him putting something in her vagina that moved ever happened. He said he has "no desire in kids at all." N.T., 3/7/19, at 360. Appellant denied all allegations of sexual misconduct with any of the children or with children generally. He did admit that one time, when K.M. came back from a summer trip to California, he held his hand to his chest, gave her a hug, and kissed the top of her head.

Appellant admitted that he told Corporal Kistle that it was possible that his hand may have touched one of the girls' vaginas while brushing mulch off of them at the park, but never intentionally. He again denied that the incident alleged to have occurred in B.B.'s room with S.S., when she allegedly found him naked and he had sex with her on the bed, ever happened.

On cross-examination, Appellant testified . . . he would give the children hugs if they were "down and out" and that he could remember giving Sk.S. a hug on her birthday. He admitted to telling Corporal Kistle that he hugged the children, including S.S. and Sk.S. all the time because he cared about them and they were "nice little girls" whose father was in jail at the time.

. . .

The Commonwealth elicited from Appellant on cross that despite his physical limitations and inability to hug anyone, he was still able to do chores around the apartment [including laundry, sweeping and mopping the floors of his apartment, sweeping the main hallways in the building, picking up trash in the yard and parking lot and mowing the grass] as well as use a saw and cut up wood.

Appellant acknowledged on cross with reference to his earlier testimony regarding his admission that he had once kissed S.S.

on the lips accidentally that he did not tell the police that this contact was unintentional, and he did admit to the police that he would kiss S.S. on the forehead and on the cheek and did, on that one occasion, kiss her on the lips.

He also confirmed on cross that he told the police that he might have accidentally touched S.S.'s vagina when he was trying to remove a leaf or mulch from that area of her body. He confirmed that he had told the police that his hand might have brushed S.S.'s chest when they passed each other in the doorway. He admitted that he would ask S.S. to marry him, but he qualified the admission by saying that he would tell her "when you get older." N.T. at 377. He said that he did this in order to see S.S. blush and run away. He said he found that "funny." N.T. at 378. . . . [Appellant stated] that he believed the four [child witnesses] were lying and fabricating the events about which they testified[, but was unaware of any ill motive they may have had to make up allegations against him].

Appellant agreed that he told police he was "attracted" to the children, but not sexually. N.T. at 379-80. He said he liked them because they are his friends. He testified that he "missed my whole—my son's whole life while I was away and I like kids." N.T. at 380. By the statement that he "likes kids," he testified that he meant he liked "to see them having fun." N.T. at 380.

. . .

After the Commonwealth withdrew Counts III through VII [Indecent Assault] and Count X [one count of Aggravated Indecent Assault], the case went to the jury who, as mentioned earlier, returned a verdict on March 7, 2019, of guilty on all of the remaining charges. They specifically found that Appellant had engaged in a course of conduct with respect to the charge of Indecent Assault (Victim Under 13 Years Old).

Trial Court Opinion, 6/18/20, at 1-27.

Appellant raises the following issues for our consideration:

1. Did the trial court err in denying Appellant's pre-trial motion entitled "Motion for Particularity of Anticipated Proof or Other Relief?"

2. Was insufficient evidence presented at trial to support the conviction on Aggravated Indecent Assault, 18 Pa.C.S.A. § 3125?

3. In creating its sentencing scheme, did the trial court err in relying upon the Aggravated Indecent Assault conviction that should have been dismissed as a violation of Appellant's due process rights pursuant to Article I, Section 9 of the Pennsylvania Constitution and the Fifth and Fourteenth Amendments to the United States Constitution or for insufficient evidence presented at trial? Did the court's consideration of this criminal conduct in formulating its overall sentencing scheme result in an inappropriate sentence imposed on all counts?

4. Did the trial court impose an illegal sentence on Count 8, Corruption of Minors?

5. Should this case be remanded to accurately reflect a single count of Aggravated Indecent Assault?

Appellant's brief, at 5.

In Appellant's first issue, he maintains that the trial court erred in denying his "Motion for Particularity of Anticipated Proof or Other Relief," filed on February 22, 2019, in response to the Commonwealth's amended Criminal Information of January 15, 2019, which added two counts of Aggravated Indecent Assault, 18 Pa.C.S.A. § 3125(a)(1)(b) and (a)(7). We review the trial court's decision to grant or deny a motion to quash a criminal information or indictment for an abuse of discretion. *Commonwealth v. Wyland*, 987 A.2d 802, 804 (Pa. Super. 2010) (citations and quotation marks omitted). A reversal of the trial court's order will be granted only where the trial court has clearly abused its discretion. *Id*.

Appellant's motion asked the trial court to enter an order directing the Commonwealth to supply sufficiently specific evidence to place him on notice of the events or timing of the Aggravated Indecent Assaults with which he was charged, and to bar the Commonwealth from presenting such evidence if it was unable to do so. In particular, the motion stated Appellant faced prosecution "for crimes alleged to have happened at an unspecified time, and as to which [Appellant] is incapable of knowing if he has defenses including, for example, by an alibi." Motion for Particularity, 2/22/19, at 3. Because the two new charges of Aggravated Indecent Assault stemmed from a single, distinct incident, different in character from the course of conduct alleged in the original Information, the motion continued, specificity with respect to the time of the event was necessary.

The trial court denied Appellant's motion by Order of March 4, 2019, as it rejected Appellant's contention that the incident forming the basis for the two Aggravated Indecent Assault charges was a "stand-alone occurrence differentiated from the continuous course of conduct outlined in the original information." Motion for Particularity, at 3. The court also weighed in favor of denying Appellant's motion the fact that the victim was a young child of tender years during the two-year course of alleged sexual abuse, which further required some leeway in setting the time frame for all the offenses charged.

The trial court determined such findings warranted denial of the motion under Rule of Criminal Procedure 560(B)(3), which provides an information must contain

- 15 -

> The date when the offense is alleged to have been committed if the precise date is known, and the day of the week if it is an essential element of the offense charged, provided that if the precise date is not known or if the offense is a continuing one, an allegation that it was committed on or about an date within the period fixed by the statute of limitations shall be sufficient[.]

Pa.R.Crim.P. 560(B)(3). The conduct alleged in the Amended Information, the filing of the charges, and the prosecution of the case all occurred within the statute of limitations.

Appellant claims that the Commonwealth's Amended Information, which gave slightly more than a two-year time-frame for the underlying act in question, offered insufficient chronological specifics of the at-issue aggravated sexual assault. On this point, Appellant cites precedent wherein our Supreme Court has held that a failure of the Commonwealth to place the date of an alleged crime with "reasonable certainty" can create due process concerns by constraining a defendant's ability to prepare a defense. *See Commonwealth v. Devlin*, 333 A.2d 888, 890-91 (Pa. 1975) (concluding Commonwealth's 14-month time frame for commission of offense failed to meet the sufficient particularity standards set by precedent, and to "hold otherwise would violate the notions of fundamental fairness embedded in our legal process.").

This Court, however, has stated the following regarding *Devlin* claims involving child victims:

> We conclude that for purposes of a *Devlin* claim, the Commonwealth must be allowed a reasonable measure of flexibility when faced with the special difficulties involved in ascertaining the date of an assault upon a young child. *See Commonwealth v. Fanelli*, [547 A.2d 1201, 1203 (Pa.Super.

- 16 -

1988) (*en banc*)]; ***Commonwealth v. Niemetz***, [ ] 422 A.2d 1369 ([Pa.Super.] 1980). On the other hand, in order to ensure a fair trial for the defendant, the Commonwealth should conduct a thorough examination and come forward with any evidence which indicates when the alleged crime is most likely to have taken place.

***Commonwealth v. Groff***, 548 A.2d 1237, 1241 (Pa.Super. 1988).

Relatedly, this Court also has observed, "the Commonwealth must be afforded broad latitude when attempting to fix the date of offenses which involve a continuous course of criminal conduct." ***Commonwealth v. G.D.M., Sr.***, 926 A.2d 984, 990 (Pa.Super. 2007) (quoting ***Groff***, 548 A.2d at 1242). This is especially true when the case involves sexual offenses against a child victim. ***Commonwealth v. Brooks***, 7 A.3d 852, 858 (Pa.Super. 2010), ***appeal denied***, 21 A.3d 1189 (Pa. 2011). A child victimized in this fashion cannot be expected to remember each and every date upon which she was victimized, particularly where the events are numerous and occur over an extended period of time. ***See Niemetz***, 422 A.2d at 1373 (Pa.Super. 1980) ("[W]e do not believe that it would serve the ends of justice to permit a person to ... sexually abuse [a] child with impunity simply because the child has failed to record in a daily diary the unfortunate details of her childhood.").

In ***Commonwealth v. Riggle***, 119 A.3d 1058 (Pa.Super. 2015), at issue was an indictment charging defendant with Involuntary Deviate Sexual Intercourse, Aggravated Indecent Assault, Indecent Assault, and Corruption of Minors in connection with the repeated sexual assault of a minor child occurring "from June 2007 to February 2008." This Court concluded the

indictment's failure to fix the dates of the offenses with more particularity did not amount to a due process violation, as Rule 560(B)(3) allowed for an allegation of offenses "committed on or about any date" within the limitations period, the defendant's ability to prepare a defense was not impaired, and the charges arose from an ongoing pattern of sexual abuse. *Riggle*, 119 A.3d at 1069-70.

Viewing the allegations presented by the Commonwealth's Amended Information in light of this deferential precedent, we find Appellant's argument meritless. The Commonwealth provided Appellant with a discrete time frame in which the sexual assaults were alleged to have occurred, namely, between January 8, 2014 and March 3, 2016. Appellant asserts, however, that the single alleged episode forming the basis for the Aggravated Indecent Assault charge should not be viewed as one of the occurrences constituting a course of sexual assaults and abuses spanning the 26-month timeframe presented in the Information, as it stands alone in its severity relative to the remaining offenses with which he is accused of committing.

We discern no basis in our precedent for excising the most invasive act of sexual assault from an alleged course of sexually abusive conduct suffered by a young child at the hands of a serial offender and applying a different notification requirement for that alleged act. The Informations at issue clearly alleged numerous episodes each of fondling the child's vagina and buttocks over clothing, forcible kissing involving penetration with the tongue, uninvited hugs, and constant verbal advances and innuendos, all allegedly perpetrated

- 18 -

by a 58 year-old man who abused his trusted position of child-sitter by singling out S.S. from the group and menacing her over a 26-month period. Part of this arc of alleged abuse is the allegation that Appellant penetrated S.S.'s vagina with a part of his body.

Fixing the times of a course of sexually abusive conduct, as was done in the instant matter, satisfies the due process concerns expressed in our jurisprudence. As discussed, *supra*, it is well-established that young victims such as S.S. possess inferior abilities to appreciate and understand the significance of time, which adversely affects the temporal precision of their accusations within a long timeline of abuse. ***See G.D.M., Sr.***, 926 A.2d at 990 (recognizing preschool and early elementary school age victims are not expected to remember exact dates, as they do not have lives revolving around the calendar; to require such detail from them "would be to give child predators free rein."). Moreover, Appellant failed to demonstrate how the asserted lack of specificity in the Commonwealth's Informations prejudiced his ability to defend himself.

Given the particular circumstances of this case, we conclude the Amended Information containing allegations forming the basis for aggravated indecent assault charges sufficiently provided a reasonably certain time frame to permit Appellant to prepare his defense. No relief is due on this claim.

In his second issue, Appellant argues that the Commonwealth presented insufficient evidence to support his conviction on Aggravated Indecent Assault, which requires penetration by the offender's body, because S.S. testified she

was unsure of precisely what had entered her vagina when a naked Appellant undressed her, placed her on a bed, lay on top of her, and started moving something inside of her. N.T., 3/5/19, at 118-119. Section 3125(a)(1)(b), Aggravated Indecent Assault, provides:

>  (a)    Except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse) and 3124.1 (relating to sexual assault), a person who engages in penetration, however slight, of the genitals or anus of a complainant **with a part of the person's body** for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if:
>
>       (1)    The person does so without the complainant's consent;
>
>       …
>
>  (b)    Aggravated indecent assault of a child. –A person commits aggravated indecent assault of a child when the person violates subsection (a)(1), (2), (3), (4), (5) or (6) and the complainant is less than 13 years of age.

18 Pa.C.S.A. § 3125(a)(1)(b) (emphasis added).

Appellant concedes the Commonwealth's proffer would have sufficed had S.S. testified that he penetrated her digitally, with his tongue, or with his penis, but he posits that without such specific testimony, the most the Commonwealth proved at his trial was Involuntary Deviate Sexual Intercourse, as the jury could not reasonably exclude the possibility that Appellant accomplished penetration with an object. We disagree.

When considering a challenge to the sufficiency of the evidence, "we must determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crime charged is established beyond a reasonable doubt." *Commonwealth v. Green*, 204 A.3d 469, 484 (Pa.Super. 2019) (citing *Commonwealth v. Dale*, 836 A.2d 150, 152 (Pa.Super. 2003)). The Commonwealth may carry its burden of proof entirely through circumstantial evidence, *id.* at 484-85, and the evidence "need not preclude every possibility of innocence," *see Commonwealth v. Knox*, 219 A.3d 186, 195 (Pa.Super. 2019), *appeal denied*, 228 A.3d 256 (Pa. 2020). In reviewing the sufficiency of the evidence, we will not substitute our judgment for that of the factfinder, who is free to believe all, some, or none of the evidence. *Id*.

At trial, S.S. testified she was playing with her friend B.B. in Appellant's apartment when she entered B.B.'s bedroom to find Appellant standing there. N.T. at 118. She could not recall when, exactly, Appellant undressed, but she testified he was naked when he removed her clothing and put her on her back atop the bed:

> **PROSECUTOR:** And when you walked in, [Appellant] took your clothing off. What happened next?
>
> **S.S.:** And then all I remember is, like, I ended up on the bed, and then, like, all I saw was him moving and I felt something and it was, like, painful and -- but I don't know what it was.

**PROSECUTOR:** When you were on the bed, were you sitting, laying [sic], or something else on the bed?

**S.S.:** I was laying [sic] there.

**PROSECUTOR:** And where was [Appellant]?

**S.S.:** He was, like, getting on the bed when I was on there.

**PROSECUTOR:** Were you [lying] on your front side, backside, or your actual side?

**S.S.:** I was [lying] on my back.

**PROSECUTOR:** And when [Appellant] was getting on the bed, where did [Appellant] go?

**S.S.:** He just went on top of me.

**PROSECUTOR:** Was he facing you or was he looking away from you?

**S.S.:** I don't remember.

**PROSECUTOR:** So you're [lying] on your back and [Appellant] was on top of you?

**S.S.:** Yes.

**PROSECUTOR:** Did [Appellant] say anything to you?

**S.S.:** Not that I can remember.

**PROSECUTOR:** And were you completely naked when this was happening?

**S.S.:** I don't remember.

**PROSECUTOR:** Can you tell us what exactly you felt?

**S.S.:** All I felt was something painful. I just felt pain.

**PROSECUTOR:** Where on your body did you feel pain?

**S.S.:** In my vagina.

**PROSECUTOR:** When you felt that pain, you said you don't know what was causing that pain?

**S.S.:** Yes.

**PROSECUTOR:** But whatever was causing you pain, can you describe if it was moving, still, or something else?

**S.S.:** It was moving.

**PROSECUTOR:** Was [Appellant] saying anything when this was happening?

**S.S.:** No.

**PROSECUTOR:** Did anyone come into the room when this was happening?

**S.S.:** No, because they were still outside playing.

**PROSECUTOR:** Did you say anything to [Appellant] when this was happening?

**S.S.:** I don't remember.

**PROSECUTOR:** What were you thinking in that moment?

**S.S:** I was confused and wondering what was going on and, like, why this was happening.

**PROSECUTOR:** If you remember, do you know how long it lasted?

**S.S.:** No, I do not remember.

**PROSECUTOR:** Was [Appellant] holding any item in his hand?

**S.S.:** Not that I saw.

**PROSECUTOR:** Did [Appellant] bring anything into the bed with him?

**S.S.:** No.

N.T. at 118-120.

Viewed in a light most favorable to the Commonwealth as verdict-winner, the evidence established beyond a reasonable doubt that Appellant penetrated S.S's vagina with either his finger or penis. S.S. was unsure about some aspects of the event she described, such as where her friends were at the time, whether Appellant spoke during the act, whether he looked at her or looked away, and how long the act lasted.

She expressed certainty, however, that she saw no object in Appellant's hands when she entered the room, and that Appellant brought no object with him to bed. According to her testimony, he lay on top of her, slid something into her vagina that caused her continuing pain, and moved it around.

The reasonable inference to be formed from the totality of such testimony was that Appellant had placed a part of his body inside the child's vagina. We conclude, therefore, that the evidence sufficed to support Appellant's conviction of Aggravated Indecent Assault as charged. Appellant's claim to the contrary is without merit.

Appellant's third issue challenges the sentencing scheme to the extent it relied in part on the Aggravated Indecent Assault conviction that he unsuccessfully has challenged in the present appeal. By Appellant's own admission, the necessary predicate to this sentencing issue is the dismissal of the Aggravated Assault charge and conviction against him: "If this Honorable Court finds, as Appellant has suggested above, that the Aggravated Indecent

Assault count should have been dismissed . . ., Appellant argues that the entirety of the sentencing scheme formulated in this case should be vacated. . . . Appellant's brief, at 46. As we have determined the Aggravated Assault conviction was proper, it follows that Appellant's present sentencing claim cannot prevail.

Next, Appellant contends that his aggregate sentence comprises an illegal three-to-six year sentence on Count 8, Corruption of Minors, a charge which, he maintains, was withdrawn by mutual understanding of the parties and the trial court prior to closing arguments and jury instructions. While the record shows that the Commonwealth announced its withdrawal of a series of enumerated counts, including count "8", a review of the entire proceedings relevant to this issue plainly shows the inclusion of Count 8 in this oral recitation was mistaken.

The exchange at issue follows:

**THE COURT:** Before I bring in the jury, Commonwealth, do you want to address the charges that are being changed on the record?

**PROSECUTOR:** Yes, Your Honor. Commonwealth is now making a motion to withdraw Counts 3, 4, 5, 6, 7 and 8, and also Count 10.

**THE COURT:** Defense?

**DEFENSE COUNSEL:** We have previous notice and we agree. That's without objection.

**THE COURT:** All right. So, the withdraw[al] of said Counts is approved by the Court. So, three through eight and ten have been

withdrawn and that is approved. All right. Otherwise, are we ready to close? Can I bring the jury in?

**PROSECUTOR:** Yes, Your Honor.

N.T., 3/7/19, at 391.

Presently, there is no dispute that Count 8 was the Corruption of Minors charge and the number "8" was included in the above statement of counts to be withdrawn. What is also beyond any reasonable dispute, however, is that every other action and proceeding relating to the charges against Appellant specifically confirm that the single count of Corruption of Minors remained one of the four charges to be handed to the jury for its deliberation at the end of trial.

Initially, Appellant admits that the prosecutor did not formally withdraw the Corruption of Minors charge by writing next to its place on the Criminal Information the word "withdrawn"—along with the date and her initials—as she did with charges one through seven and 10. Appellant's brief, at 52.

Moreover, at the charging conference, which took place just moments before the statement of withdrawn counts in question, the court verified that the parties had agreed upon the Corruption of Minors jury instruction. "The attorneys and I have met at length regarding the proposed instructions and the following is the end result of said conference." N.T. at 385. The agreed-upon instructions to the jury were discussed, and, in relevant part, the court announced the jury instruction to be given for the Corruption of Minors charge: "15.6301(A), corruption of minors, paragraph one – 1(c), the descriptive

language, to be given along with that shall be 'by having sexual contact with her,' also by agreement." N.T. at 387.

Additionally, during closing arguments, the Commonwealth began by providing the jury with an overview of its proffer with respect to the four charges prosecuted. "Here are the four charges. First and foremost we have solicitation to commit rape of a child. Secondly, we have indecent assault of a child. The third charge is aggravated indecent assault of a child. And the fourth charge is corruption of minors." N.T. at 391.

After discussing each of the first three charges, the prosecutor turned to the Corruption of Minors charge:

> **PROSECUTOR:** I'm going to move onto the last crime and that is corruption of minors. Corruption of minors in Pennsylvania is a very broad statute. This can encompass any action. It doesn't even have to be a criminal action. It just a [sic] has to be some sort of action that an adult, somebody over 18 years old, does to, or with, or for a child or someone under 18 years old and that action in and of itself corrupts the morals of a minor.
>
> So, [Appellant] is over 18 years old. You may have wondered why I asked Corporal Kistle if she remembered if the defendant is over 18. That's why I asked that. [S.S.] was under 18. We know she's under 18. I submit to you sexually assaulting a child as young as seven, eight years old, asking a child that young to marry you corrupted her morals.

N.T. at 422-23.

Defense counsel presented his closing argument, after which the court gave the jury a short break. During this time, the parties and the court reviewed the verdict slip, which also contained the corruption of minors charge. N.T. at 434-438.

Finally, when the jury returned from break, the court delivered its jury charge, which included the agreed-upon instruction for corruption of minors:

> **THE COURT:** [Appellant] has also been charged with corruption of a minor. To find [Appellant] guilty of this offense, you must find that each of the following three elements has been proven beyond a reasonable doubt. First, that [Appellant] was 18 years of age or older at the time of the incident giving rise to the charge. Second, that [S.S.] was under 18 years of age at that time. And third, that [Appellant] corrupted or intended to corrupt the morals of [S.S.] by having sexual contact with her.

N.T. at 459-60. Upon completing the charge, the court asked counsel if they had any objections to either the jury charge or the verdict slip, to which defense counsel responded he did not. N.T. at 461.

Here, Appellant centers his legality of sentence challenge on the fact that he was convicted and sentenced on a count that the prosecutor had earlier included in a series of counts, identified by number only, to be withdrawn. Notably, Appellant does not contend that the Commonwealth gave notice of its intent to withdraw the corruption of minors charge by name.

He even acknowledges "that possibly the prosecutor could have simply misspoken [and] the parties did not take notice of this error." Appellant's brief, at 53. He contends, however, that the particular way the prosecutor listed the withdrawn counts undermines the possibility of mistake: "In phrasing it to the court as we are withdrawing three through seven, and count 8 and count 10, it seems the prosecutor was deliberately withdrawing the

Corruption of Minors charge and not simply mistaking count 8 for another count of Indecent Assault." *Id*.[1]

We derive no such insight from the prosecutor's manner of reciting the series of numbers withdrawn. In fact, though we deem Appellant's point in this regard a relatively minor one, we note our disagreement with his characterization of how the prosecutor listed the counts, as she did not segregate count 8 from counts 3 through 7. As the above-quoted excerpt shows, she listed each count by number separately, from 3 to "7 and 8, and also 10." Indeed, even the trial court appeared to understand the series beginning with "3" included count "8", as it acknowledged, "So, three through eight and ten[.]" N.T. at 3/7/19 at 391.

Because the trial record establishes that the Corruptions of Minors charge was not formally withdrawn, and given how the Commonwealth and court otherwise appropriately developed for the jury's benefit both the trial record and the jury instruction relating to the Corruption of Minors charge, we need not assign much significance to Appellant's present argument. Indeed, other than citing to the general proposition that a legality of sentence claim may be raised for the first time in a timely appeal, Appellant develops no argument, let alone one with citation to authority, bearing on the consequences of an apparent misstatement of withdrawing a charge that, by

---

[1] Whereas Appellant places a comma after the "7" in his reproduction of the notes of testimony, the notes of testimony do not, in fact, include such a comma setting off the number 7 from the words "and 8" that follow.

every other indication in the record, continued to be prosecuted openly and actively without confusion, surprise, or objection.

Our jurisprudence recognizes legality of sentencing claims based on errors with the sentence that are either patent or apparent upon consideration of the record. *See*, *e.g.*, *Commonwealth v. Holmes*, 933 A.2d 57, 67 (Pa. 2007) (recognizing trial court's inherent power of correction encompasses not only patent and obvious errors that appear on the face of an order, but also errors that emerge upon consideration of information in the record). This is not such a case. Careful consideration of the record before us dispels any reasonable concern that Appellant was prosecuted, convicted, and sentenced on a withdrawn charge. The present issue is, thus, utterly without merit.

In Appellant's final issue, he submits the trial court imposed an illegal sentence on his conviction for a single count of Aggravated Indecent Assault because the sentencing sheet bifurcates the single count, which comprises subsections (a)(1) and (b) of the statute, into two counts—Count IX and Count XI—with each count containing one of the subsections for the sole purpose of accommodating an apparent idiosyncrasy in the county's case management system. Among Appellant's concerns is that the sentencing sheet creates a false portrayal of his having been convicted of two counts of Aggravated Indecent Assault, an inaccuracy that may produce future adverse consequences. He asks that we vacate sentence and remand to allow the trial court to correct the docket and sentencing sheet.

For its part, the trial shares Appellant's concerns:

After the Commonwealth withdrew the Aggravated Indecent Assault charge at Count X, there was only one (1) remaining Count of Aggravated Indecent Assault, Count IX. This remaining Aggravated Indecent Assault was charged in one count of the Information under the following subsections: 18 Pa.C.S.A. § 3125(a)(1) and (b). However, it remained only one (1) charge of Aggravated Indecent Assault. It was presented to the jury as one (1) count of Aggravated Indecent Assault, and the jury found [Appellant] guilty of this one (1) count of Aggravated Indecent Assault.

However, because of the two (2) separate subsections of 18 Pa.C.S.A. § 3125 involved, each of which were part of the one (1) offense of Aggravated Indecent Assault and were required to be proven together in order to establish the single crime as charged here, on the Sentencing Sheet, the two (2) subsections of Aggravated Indecent Assault were separated and assigned different count numbers. Subsection 3125(a)(1), the "lack of consent" portion of the charge, was listed as Count IX, and a Count XI was added, only for sentencing purposes, to incorporate the "victim under 13 years of age" portion of the charge. Count IX was deemed to merge into Count XI, and thus a sentence was only imposed on Count XI.

However, the Information did not charge a Count XI, only a Count IX, and the jury was only presented with the Aggravated Indecent Assault as charged in Count IX of the information. In writing this Opinion, we questioned the propriety of addressing the different subsections of § 3125 in this manner, as we read subsection (b) as only a grading enhancement for the substantive crime set forth in subsection (a)(1), and so we convened a conference between counsel and the Court on June 11, 2020 to determine what, if anything, could be done to correct what appeared to be a patent error in the Sentencing Sheet.

Counsel agreed with our interpretation of subsection (b); however, it was indicated that the division of the offense into separate counts for purposes of sentencing was required in order to code the offense into CPCMS. The prosecution contacted the AOPC and did not receive a definitive answer with respect to the question of how Aggravated Indecent Assault under section 3125(a)(1) with the grading enhancement at section 3125(b) ought to be treated for purposes of coding on CPCMS. We

- 31 -

confirmed with our Clerk of Courts and the staff at CPCMS, however, that separation of these subsections into different, albeit manufactured, counts is the method used to ensure that the single offense of Aggravated Indecent is properly coded into CPCMS.

While we are still not persuaded that breaking the subsections down into two (2) counts of Aggravated Indecent Assault is a proper treatment of the single offense, particularly as it may impact an outside observer's understanding of the [Appellant's] prior record and number of present offenses of which he was convicted, it appears that there is little we can do to change the practice at this point, given the information we have received from our Clerk of Courts and CPCMC. We have also been advised by our Clerk of Courts that this case has been placed under the auspices of Limited Access through the Clean Slate Limited Access statute. *See* 18 Pa.C.S.A. §§ 9122.1, 9122.2, and 9122.3. We did not issue an Order declaring this case to be a Limited Access case under these statutes, and our reading of the statutes indicate that sexual offenses are excluded from the ability to seek the protections of these statutes. *Id*.

Our Clerk of Courts has indicated that this Limited access status is another hindrance to our ability to amend the Sentencing Sheet to reflect the actual manner in which the single crime of Aggravated Indecent Assault was charged and found by the jury.

Because it appears at this time that we are unable to achieve a more accurate reflection on the Sentencing Sheet of the charge and the verdict, at least not without severely delaying the progress of this appeal, we are keeping the Sentencing Sheet the way it stands at present, with the single offense of Aggravated Indecent Assault under subsections 3125(a)(1) and (b) as separate counts, with the indication that Count IX, reflecting the lack of consent portion of the charge, merged into Count XI , the separate count manufactured to permit the single offense to be properly coded in CPCMS. However for purposes of this Opinion, we are referring to the single count of Aggravated Indecent Assault as Count IX, as that is how it was charged in the Information and presented to the jury.

Trial Court Opinion at 5-6 n.3

It is beyond dispute that while Appellant was found guilty of, and sentenced on, one count of Aggravated Indecent Assault, both his sentencing sheet and criminal docket list two counts of Aggravated Indecent Assault. Though we are sympathetic to the electronic case management difficulties that have apparently arisen with cataloguing Appellant's count under Section 3125(a)(1)(b), it would seem beyond all peradventure that the solution cannot be to add to his sentencing sheet a fictitious, second criminal count that never even appeared as a charge on the criminal information. Given the trial court's serious reservations regarding this process, which came to its attention only after it was without jurisdiction to remedy the matter, we find the most appropriate course is to remand to permit the court to ensure that Appellant's certified record generally, and sentencing sheet specifically, lists Count IX as his sole conviction of Aggravated Indecent Assault.

Judgment of sentence is affirmed in all respects except for the certified record's and sentencing sheet's listing of two aggravated indecent assault convictions for purposes of cataloguing the sole count, Count IX, on which Appellant was convicted and sentenced. Case remanded to correct the record and sentencing sheet in this regard. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/21